IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.: 2:14-CR-636-WKW |
| | ) | |
| CHAD LAMAR HOGAN | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

Before the court is Defendant's "Motion to Suppress" (Doc. 19), wherein Defendant seeks "an Order suppressing any items seized, any statements made, and any fruits of those items and statements obtained as a result of [Defendant's] warrantless arrest." Def.'s Mot. (Doc. 19) at 1. The Government has responded (Doc. 23) to the motion and, on March 19, 2015, the undersigned conducted an evidentiary hearing on the matter at which the Government presented testimony and evidence in support of the lawfulness of Defendant's arrest. The Government and Defendant both filed post-trial briefs. Gov't's Br. (Doc. 29); Def.'s Br. (Doc. 30). The matter is now ripe for report and recommendation to the District Judge. Upon consideration of Defendant's motion, the Government's response, and the evidence and testimony adduced at the evidentiary hearing, the undersigned Magistrate Judge RECOMMENDS that the motion to suppress be DENIED.

## I.     FINDINGS OF FACT[1]

In June 2013, Detective Greg Schnupp ("Schnupp"), a detective of five years with the Montgomery Police Department ("MPD"), was investigating a string of armed home-invasion robberies.   Tr. 21:10-21, 22:15-16;[2] Gov't's Ex. 1.[3]   Following one such robbery, MPD canvassed the victim's neighborhood and encountered a neighbor who reported having seen a white Ford Expedition near the scene prior to the crime.  Tr. 23:2-6, 21.   The neighbor had written down the license plate number of the vehicle and provided that to MPD.  Tr. 23:2-6.   MPD later discovered the vehicle was registered to Defendant.  *Id.*

Based on that neighbor's report, Det. Schnupp "developed [Defendant] as a suspect" and "created a ['be on the lookout'] bulletin ("BOLO") for him to be picked up and brought down to the criminal investigations division to be questioned."  Tr. 22:17-24. On the left side, the BOLO included a picture of Defendant and his name, date of birth, race, sex, height, and weight.  Gov't's Ex. 1.  The right side read as follows:

> WANTED by the Montgomery Police for Robbery 1st Degree
> (Questioning only)
> Hogan is wanted for Questioning in the Robbery 1st Degree that occurred
> on Thursday, June 13, 2013 at 0542 hours at 117 N. Charleston Place.
> L[ast ]K[nown ]A[ddress]:  1338 Karen Valley Place
> Possible Vehicles:

---

[1]  The Court reaches findings of fact at a suppression hearing based on a preponderance of the evidence.  *United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

[2]  All transcript citations herein refer to the transcript (Doc. 24) of the evidentiary hearing held on March 19, 2015.

[3]  All exhibit citations herein refer to exhibits admitted into evidence at the evidentiary hearing held on March 19, 2015.

> 89 Blue Chevy Camaro Tag #3A61V49
> 02 Ford Expedition Tag #3A88V48

*Id.*  Detective Schnupp pulled Defendant's criminal background and discovered that he was a convicted felon.  Tr. 25:6-7, 26:16-20.  Based on Defendant's prior criminal history and reports by all the victims of the robberies that the offenders were armed, Det. Schnupp added a note to the BOLO that "Hogan should be considered ARMED AND DANGEROUS."  Tr. 25:1-7; Gov't's Ex. 1.  The BOLO also instructed the officers, "[i]f [Defendant is] located[,] notify Unit 466/Schnupp or any Major Crimes Detective." Gov't's Ex. 1.

Detective Schnupp did not obtain a warrant for Defendant's arrest.  Tr. 24:12-14. When asked at the hearing why he had not done so, Det. Schnupp replied that, although he could have obtained an arrest warrant, he "had probable cause for questioning at that time.  [He] was trying to build [his] case against [Defendant] as far as more evidence at that time."  Tr. 24:15-22.

At morning roll-call on the morning of June 16, 2013, MPD supervisors issued the BOLO to the patrol units beginning their shifts, providing them with a paper copy of the BOLO to place in their patrol vehicles.  Tr. 10:15-23, 24:15-19.  MPD also emails a copy of BOLOs to the patrol units.  Tr. 10:17.

Corporal Steven Wesley Pearson ("Corporal Pearson" or "Cpl. Pearson") was a five-year corporal in the patrol division of the MPD.  Tr. 3:25, 4:1-3.  While out on patrol that morning, Cpl. Pearson "went to go by [Defendant]'s address," where he saw a white Ford Expedition in the driveway.  Tr. 5:8-11.  The vehicle appeared to be running.  *Id.*

3

Corporal Pearson waited in his patrol vehicle on the street for Defendant to leave his residence. Tr. 5:11.

At approximately noon, Defendant left his residence and got in the Expedition. Tr. 5:11-14, 6:1. As Defendant's vehicle approached a stop sign, Cpl. Pearson "could identify a male driver" in the vehicle. Tr. 6:13-15. Corporal Pearson "[p]ulled in behind the vehicle when [Defendant] pulled out, verified the tag number versus the BOLO, and then made [a] traffic stop of the vehicle." Tr. 6:15-17. Cpl. Pearson acknowledges that he pulled Defendant over based solely on the BOLO and not for the commission of any other offense or traffic violation. Tr. 12:24-25, 13:1-12. In fact, when asked what his intention was in stopping Defendant's vehicle, Cpl. Pearson responded that he intended to identify Defendant as Chad Hogan and then transport him to speak with the detectives. Tr. 8:21-25. Corporal Pearson also agreed that once he pulled Defendant over and identified him as the subject of the BOLO, "he was not going to be free to leave." Tr. 13:13-16.

Corporal Pearson "[a]pproached the vehicle," and, "because of the nature of the incident," he "instructed Defendant to place his hands on the steering wheel where [Cpl. Pearson] could see them." Tr. 7:5-7. Corporal Pearson "instructed the driver to exit the vehicle and placed him in handcuffs for officer safety." Tr. 17:13-25, 18:1-4; Def.'s Ex. 1. Defendant then "identified himself as Chad Hogan." Tr. 18:8-12; Def.'s Ex. 1. At that time, Cpl. Pearson "asked [Defendant] if he had any weapons, needles, [or] anything that could stick . . . or hurt" Cpl. Pearson. Tr. 7:10-12. Defendant advised Cpl. Pearson that "there was a gun in the car but [Defendant] didn't have anything on him." Tr. 7:12-

4

13, 7:22-25.  At that time, Det. Schnupp knew Defendant was felon, but Cpl. Pearson did not.  Tr. 26:16-25.

Corporal Pearson advised Defendant "he was being detained for questioning by the detective division in reference to an incident," "escorted [Defendant] to the back of his vehicle, sat him on the curb, [and] waited for our backup units to get there."  Tr. 7:16-20.  While waiting on backup to arrive, Cpl. Pearson contacted Det. Schnupp.  Tr. 8:17-20, 25:8-10.  When Det. Schnupp learned that there was a firearm in Defendant's vehicle, he told Cpl. Pearson "to make sure that [Defendant] was handcuffed and that if he did not have the permit for it, that he was currently under arrest for being in possession of a firearm."  Tr. 25:8-14.  Backup units arrived within a "couple minutes," at which point Cpl. Pearson placed Defendant in his police vehicle and transported him to the criminal investigations division.  Tr. 8:12-16.

## II.  DEFENDANT'S ARGUMENT

Defendant moves the court "for an Order suppressing any items seized, any statements made, and any fruits of those items and statements obtained as a result of his warrantless arrest."  Def.'s Mot. (Doc. 19) at 1.  His argument, overall, is that Defendant's statement that there was a firearm in his vehicle, and the firearm that was found as a result of that statement, should be suppressed because Cpl. Pearson did not have lawful authority to initiate a traffic stop or to subsequently arrest Defendant and that no arrest warrant had issued.  *Id.*

More specifically, Defendant contends, first, that Cpl. Pearson specifically set out to arrest Defendant and he effectuated that arrest the moment he stopped Defendant's

vehicle, but that Cpl. Pearson did not, at that time, have probable cause to believe that Defendant was involved in the robberies or any other crime. *Id.* at 4. Second, Defendant argues that Cpl. Pearson's stop of Defendant's vehicle cannot be classified as a typical *Terry* traffic stop because "the seizure and custodial arrest" of Defendant at the time of the stop was "not part of a typical traffic stop." *Id.* Defendant bases this argument on the fact that Defendant was not stopped for any traffic violation, was immediately placed in handcuffs, and "was never going to be free to leave the scene except to go downtown for questioning." Def.'s Br. (Doc. 30) at 3. Third, Defendant asserts that, even if the stop was considered under *Terry*, that Pearson "had no articulable suspicion that [Defendant] was involved in any criminal activity *at that time*." Def.'s Mot. (Doc. 19) at 4.

Defendant also briefly mentions in his motion to suppress that Defendant was not advised of his *Miranda* rights prior to being questioned about whether he had any weapons. *Id.* at 3. Additionally, in the post-hearing brief, Defendant contends that "if the arrest was illegal, then so was the search" of Defendant's vehicle to locate the firearm. Def.'s Br. (Doc. 30) at 3.

## III.   DISCUSSION

The Fourth Amendment to the United States Constitution guarantees the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizure." U.S. Const. amend. IV. As the Eleventh Circuit has recognized:

> The Supreme Court has identified at least three separate categories of police-citizen encounters in determining which level of Fourth Amendment scrutiny to apply: (1) brief, consensual and non-coercive interactions that

do not require Fourth Amendment scrutiny, *Florida v. Bostick*, 501 U.S. 429 (1991); (2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied, *Terry v. Ohio*, 392 U.S. 1 (1968); and (3) technical arrests, full-blown searches or custodial detentions that lead to a stricter form of Fourth Amendment scrutiny, *Brown v. Illinois*, 422 U.S. 590 (1975).

*United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003).

Brief, consensual and non-coercive interactions between police and citizens, the first category addressed above, do not require any particular level of suspicion on the part of the officer and are not viewed as seizures under the Fourth Amendment. *United States v. Griffin*, 696 F.3d 1354, 1360 (11th Cir. 2012) (quoting *Muehler v. Mena*, 544 U.S. 93, 101 (2005)) ("The Supreme Court has 'held repeatedly that mere police questioning does not constitute a seizure.'").

The second category, investigative stops short of arrests as governed by *Terry*, are subjected to limited Fourth Amendment scrutiny requiring only a reasonable suspicion of criminal wrongdoing. *Terry*, 392 U.S. at 30. Reasonable suspicion demands "considerably less" than probable cause, but "the police are required to articulate some minimal, objective justification for the stop." *United States v. Mikell*, 102 F.3d 470, 475 (11th Cir. 1996).

The third category, technical arrests or custodial detentions, require an arrest warrant or that an officer have probable cause to believe that a crime has occurred. *United States v. Watson*, 423 U.S. 411, 415 (1976). "Probable cause to arrest exists when the totality of the facts and circumstances support a reasonable belief that the suspect had

committed or was committing a crime."  *United States v. Lindsey*, 482 F.3d 1285, 1291

(11th Cir. 2007) (internal quotation omitted). [4]

### A.     The Initial Stop of Defendant's Vehicle

### 1.     No probable cause at the time of the initial vehicle stop

The Government contends that, at the moment Cpl. Pearson stopped Defendant's

vehicle, there was probable cause to believe that Defendant was involved in the

robberies.  Gov't Resp. (Doc. 23) at 4; Gov't Br. (Doc. 29) at 5-7.  In support of this

contention, the Government emphasized that Cpl. Pearson and Det. Schnupp believed

they had probable cause.  *See* Tr. 9:10-13, 27:19-22, 29:24-25, 30:7-10, 30:23-24;

Gov't Br. (Doc. 29) at 6.  Even taken as true,

> the subjective beliefs of [an officer] are irrelevant to our probable cause
> analysis. Probable cause issues are to be decided on an objective basis by

---

[4] As a preliminary matter, the court is disturbed by assertions made at the evidentiary hearing by Det. Schnupp and Cpl. Pearson, who is now a federal Border Patrol Agent.  Both officers, at different points of the hearing, referenced "probable cause for questioning."  Tr. 9:19-22, 24:16-18.  The most concerning of such statements was Schnupp's response when asked why he had not obtained an arrest warrant for Defendant.  He responded, "I had probable cause for questioning at that time.  I was trying to build my case against Hogan as far as more evidence at that time."  Tr. 24:15-18.  Later, the court sought clarification, and asked Schnupp, "at the time [Defendant] was arrested, you wanted – you didn't have enough information and you wanted to bring him down for questioning?," to which he responded affirmatively.  Tr. 26:9-15.

The Fourth Amendment does not require that an officer have probable cause to *question* an individual.  Rather, probable cause must exist prior to *arresting* an individual.  The officers' implication that there is some lower standard necessary to handcuff, detain, and transport to the police station—*i.e., arrest*—an individual for the sole purpose of questioning is unsupported by law.  Regardless of whether the goal is merely to question or to initiate formal criminal charges, an arrest is an arrest, which requires a warrant or facts sufficient to establish probable cause that the arrestee has committed a crime.  *Dunaway v. New York*, 442 U.S. 200 (1979).  In order to continue building his case, Det. Schnupp was welcome to attempt to have a consensual encounter with Defendant during which Det. Schnupp could have questioned him, or to conduct a brief investigatory stop pursuant to *Terry*, if supported by reasonable suspicion.  However, Det. Schnupp was not permitted to try to build his case against Defendant by having him arrested on less than probable cause.

courts without regard to the subjective beliefs of law enforcement officers, whatever those beliefs may have been. *See, e.g.*, *Whren v. United States*, 517 U.S. 806, [813] . . . (1996) ("Subjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis."); *Ornelas v. United States*, 517 U.S. 690, [696] . . . (1996) (probable cause is based upon evaluation of the "facts, viewed from the standpoint of an objectively reasonable police officer"); *United States v. Roy*, 869 F.2d 1427, 1433 (11th Cir. 1989) (rejecting notion that probable cause turns on what law enforcement officers think and holding that "[c]ourts determine the existence of probable cause"); *United States v. Clark*, 559 F.2d 420, 425 (5th Cir. [1977]) ("[E]ven though a police officer believed that probable cause was lacking, the Court still had the duty to objectively determine if probable cause was present."), *cert. denied*, 434 U.S. 969 . . . (1977); *see also Horton v. California*, 496 U.S. 128, 136-40 . . . (1990) ("[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.").

*Craig v. Singletary*, 127 F.3d 1030, 1042-43 (11th Cir. 1997); *see also Miller v. Harget*, 458 F.3d 1251, 1260 (11th Cir. 2006) ("It is well-settled that an officer's subjective motivations do not affect whether probable cause existed."); *Durruthy v. Pastor*, 351 F.3d 1080, 1088 n.5 (11th Cir. 2003) ("There is no question that an officer's subjective intent is immaterial when there is an objectively reasonable basis for believing that an offense has occurred.").

Accordingly, the court must decide, on an objective basis without regard to the subjective beliefs of the officers involved, whether there was probable cause that Defendant committed the robberies.  Corporal Pearson testified to his belief that the existence of the BOLO alone established probable cause that Defendant was involved in the robberies.[5]  Tr. 9:1-13.   The Government does not point the court to any legal

---

[5] In fact, Cpl. Pearson stated that he has "stopped folks on BOLOs and arrested them based solely on a BOLO without an arrest warrant" "numerous times."  Tr. 9:14-16.  Corporal Pearson

authority that the issuance of a BOLO, on its own, is sufficient to establish probable cause for an arrest.

Further, a reading of the BOLO itself would not establish for an objectively reasonable officer a belief that there is probable cause to arrest Defendant. The BOLO says in two different places that Defendant is wanted only for questioning—not for arrest.[6]  Gov't Ex. 1.  Corporal Pearson even testified that he was "issued [the BOLO] **for questioning** that morning in [his] morning roll call."  Tr. 5:5-6 (emphasis added). Further, the BOLO explicitly instructs that Det. Schnupp should be notified if Defendant is "located"—again, this does not call for Defendant to be arrested.  Gov't Ex. 1.  Nor does the BOLO indicate why Defendant is a suspect in the robberies.  Corporal Pearson did not testify that he had any information about the facts known to Det. Schnupp at the time he created the BOLO, and Cpl. Pearson did not contact Det. Schnupp in order to determine if the BOLO was supported by probable cause.

To assess the existence of probable cause, courts may consider "the collective knowledge of law officers if they maintained at least a minimal level of communication

---

believed that the detectives issuing BOLOs "had probable cause that the subject was involved in the incident and was wanted for questioning, that the[ detectives] were probably just furthering their investigation before signing warrants."  Tr. 9:17-22.  Again, to the extent officers are conducting actual arrests merely for the purpose of questioning based upon an insufficient showing of probable cause, the practices described by the Government's witnesses are disturbing.

[6] Despite the "questioning only" language on the BOLO, Cpl. Pearson states that when he stopped Defendant's vehicle, he intended "to identify him . . . and then transport him to the detective division."  Tr. 8:21-25.  Corporal Pearson also admitted on cross-examination that once he pulled Defendant over and identified him as the subject of the BOLO, "[Defendant] was not going to be free to leave."  Tr. 13:13-16.  Again, *see supra* n.4 & n.5, it appears that Cpl. Pearson believes questioning an individual and arresting an individual are synonymous.  The Fourth Amendment recognizes no such equivalence.

during their investigation." *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985).

However, in this case, even considering the collective knowledge of Cpl. Pearson and

Det. Schnupp, there was not probable cause to believe that Defendant was involved in the

robberies.   At the evidentiary hearing, the following exchange took place between the

Government and Det. Schnupp:

> [Government]:   What did you do once you had established the defendant as a suspect in those robberies?
>
> [Det. Schnupp]:  Once I had developed him as a suspect, I created a lookout for him to be picked up and brought down to the criminal investigations division to be questioned.
>
> [Government]:   And what was your basis or standard at the time for having him brought downtown?
>
> [Det. Schnupp]:  During the investigations, it was – one of his vehicles was observed prior to the home invasion at a scene where a neighbor saw his vehicle, got his tag, and after the home invasion, when we were doing our canvass of the neighborhood, provided that car tag to us.
>
> [Government]:   And anything else leading you to Chad Hogan as a suspect?
>
> [Det. Schnupp]:  One of the codefendants implicated him in the offenses.
>
> [Government]:   And was that before or after the [BOLO] had been issued?
>
> [Det. Schnupp]:  I'm – I'm not a hundred percent sure if it was before or after.  I'd have to go back to my notes.

Tr. 22:20-25, 23:1-11.  The Government did not have Det. Schnupp consult his notes.

Thus, the only fact, as established at the evidentiary hearing, that lead Det. Schnupp to

believe that Defendant was involved in the robberies is that, at some time prior to a

robbery, a neighbor observed Defendant's vehicle—not Defendant himself—"at a scene."

This is not probable cause.

The court finds that, at the time Pearson stopped Defendant's vehicle, there was no probable cause to arrest Defendant for his involvement in the robberies based solely on the BOLO.

## 2.     Initial stop of Defendant's vehicle was not an arrest

Based on the lack of probable cause, if Defendant was under arrest at the time his vehicle was stopped, such an arrest was unconstitutional.  Defendant argues that he was under arrest at the time of the stop because "Pearson initiated contact with [Defendant] for the express purpose of questioning [Defendant] about and arresting him for his possible involvement in a string of home invasion robberies."  Def.'s Mot. (Doc. 19) at 4.

It is clear in this case that Cpl. Pearson set out specifically to find Defendant with the ultimate goal of transporting him to the criminal investigations division for questioning.[7]  However, just as courts do not consider subjective intent when analyzing probable cause, an officer's subjective intentions are irrelevant to the determination of whether a formal arrest has taken place.  "It is irrelevant whether [officers] intended to detain [a defendant] only long enough to confirm the existence of a warrant, or for some

---

[7]  *See* Tr. 5:5-12 (after being given the BOLO, Cpl. Pearson "actually went to go by [Defendant]'s address and seen his vehicle in the driveway, appeared to be running.  Waited for the subject to leave the residence and made the traffic stop at that point"), 6:4-10 (Cpl. Pearson has, on numerous occasions, sought out suspects based on BOLOs as part of his duties with MPD), 8:21-25 ("Before the defendant told [Cpl. Pearson] he had a gun in his car," Cpl. Pearson's intention when stopping the vehicle was "[t]o identify [Defendant] to see if he was the – indeed the suspect wanted in the [BOLO] and then transport him to the detective division."), 9:23-25 (Cpl. Pearson "would frequently take people [he] had stopped and arrested on [BOLO]s to the criminal investigations division"), 13:13-20 ("Once [Cpl. Pearson] pulled [Defendant] over and found out that he was Chad Hogan, he was not going to be free to leave.  . . .  [O]nce he identified himself as Chad Hogan, he was headed downtown."), 19:18-19 ("From the moment that [he] made th[e] traffic stop," Cpl. Pearson knew Defendant "w[as] always going to [be taken to the criminal investigations division] for questioning.").

longer period; what matters is that the stop and detention that occurred were in fact no more intrusive than would have been permitted an experienced officer on an objective reading of [a BOLO]." *United States v. Hensley*, 469 U.S. 221, 234-35 (1985).

> [I]t "is irrelevant" whether the officers possessed an uncommunicated intention to make a full-fledged arrest.  In other words, *Hensley* instructs, as other courts have also concluded[, including the First and Fifth Circuit Courts of Appeal], that the mere fact an officer's subjective intention was to make an arrest does not itself bar upholding the officer's conduct under *Terry* if the objective circumstances were consistent with a mere investigative stop.  . . .  These are merely particular applications of the broader principle, as expressed by the Supreme Court in *Scott v. United States*,[436 U.S. 128 (1978),] that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."

Wayne R. LaFave, *Search and Seizure:  A Treatise on the Fourth Amendment*, 4 Search & Seizure § 9.2(e) (5th ed. 2014) (footnotes omitted); *see also Arkansas v. Sullivan*, 532 U.S. 769, 771-72 (2001) (concluding that subjective motivations are irrelevant with regard to validity of an arrest:  "[I]n *Whren*[, 517 U.S. at 813] . . . [the Court] noted [its] 'unwilling[ness] to entertain Fourth Amendment challenges based on the actual motivations of individual officers.'  . . .  That *Whren* involved a traffic stop, rather than a custodial arrest, is of no particular moment."); *United States v. Mendenhall*, 446 U.S. 544, 554, n.6 (1980) (In determining whether a formal arrest has taken place, "the subjective intention of [an officer] . . . to detain [a defendant], had []he attempted to leave, is irrelevant except insofar as that may have been conveyed to the [defendant].").

Accordingly, Cpl. Pearson's subjective intent is not relevant to this Fourth Amendment analysis, and the court must review the stop and detention that actually

occurred to determine whether it was in fact no more intrusive than would have been permitted an experienced officer on an objective reading of the BOLO.  *Hensley*, 469 U.S. at 234-35.  An objectively reasonable police officer would be aware that, "[e]ven in the absence of probable cause, the police may stop a car and briefly detain it and its occupant to investigate a reasonable suspicion that such person is [or has been] involved in criminal activity."  *Mikell*, 102 F.3d at 474 (citing *Terry*, 392 U.S. at 21); *see also Hensley*, 469 U.S. at 229.

Applying the requisite objective analysis, the court finds that Cpl. Pearson's intent to arrest Defendant on the BOLO did not make the stop of Defendant's vehicle a formal arrest.  Rather, the initial stop should be analyzed under the rules articulated in *Terry*, which are set out further below.

### B.     The **Terry** *Stop and Frisk*

The Fourth Amendment is not violated when police officers conduct warrantless investigatory stops based upon a reasonable suspicion of criminal wrongdoing.  *See Terry*, 392 U.S. at 30.  "This includes the right to stop a moving vehicle," "and also includes investigations of past crimes."  *United States v. Webster*, 314 F. App'x 226, 228-29 (11th Cir. 2008) (citing *Hensley*, 469 U.S. at 226, 229).

> In our review of whether there was reasonable suspicion, we look at the totality of the circumstances.  *See United States v. Arvizu*, 534 U.S. 266, 273 [(2002)].  Reasonable suspicion is a somewhat abstract standard that "is not readily, or even usefully, reduced to a neat set of legal rules."  *United States v. Sokolow*, 490 U.S. 1, 7 [(1989)] (internal citation and quotation marks omitted).  What we do know are the bounds.  Reasonable suspicion demands "considerably less" than probable cause, but "the police are required to articulate some minimal, objective justification for the stop."  *United States v. Mikell*, 102 F.3d 470, 475 (11th Cir. 1996).  That

14

justification may be based on the information available to the officer at the time. *See Arvizu*, 534 U.S. at 273[]; *cf. United States v. Gonzalez*, 969 F.2d 999, 1003 (11th Cir. 1992) (probable cause determination considers "whether the *objective facts available to the officers at the time of arrest* were sufficient to justify a reasonable belief that an offense was being committed") (emphasis added).

*Webster*, 314 F. App'x at 228-29.

An officer may rely on information provided in a BOLO to form the reasonable suspicion for a *Terry* stop.  *Hensley*, 469 U.S. at 234 ("An objective reading of [a BOLO stating that an individual was wanted for questioning] would lead an experienced officer to conclude that [the individual] was at least wanted for questioning and investigation [by the officers who created the BOLO] . . . [, which] would justify a brief stop to check [the individual]'s identification, pose questions, and inform the suspect that the [officers who created the BOLO] wished to question him"); *see also Webster*, 314 F. App'x at 227, 229 (finding that "a BOLO for a dark-colored vehicle with something to the effect of 'Down South Customs' written on the rear window," although "far from a model of clarity," "sufficiently narrow[ed] the field of suspected vehicles so as to support reasonable suspicion for a Terry stop").

In this case, the BOLO included a picture of Defendant; his name, social security number, date of birth, race, sex, height, and weight; why he was wanted; his last-known address; and his possible vehicles, including year, make, model, and license plate number.  Gov't's Ex. 1.  This combined information sufficiently narrows the field of suspected vehicles so as to support reasonable suspicion for a *Terry* stop.  Additionally, prior to the stop, Cpl. Pearson was able to identify that the vehicle he had located, which

was at the address identified as Defendant's residence on the BOLO, matched the vehicle make and model as described in the BOLO.  Tr. 6:1-3, 11:10-12.  Corporal Pearson was also able to verify that the license plate number on the BOLO was the same as the license plate number on the vehicle he located.  Tr. 6:15-17.  Further, the BOLO described Defendant as a male, and when Defendant drove the car out of the driveway, Cpl. Pearson was able to see that a male was driving.  Tr. 6:13-15.  This is sufficient to establish reasonable suspicion.  Accordingly, the initial stop of the vehicle did not violate the Fourth Amendment as it was supported by the necessary reasonable suspicion for a brief investigatory stop pursuant to *Terry*.

After stopping Defendant's vehicle, Cpl. Pearson "instructed [Defendant] to exit the vehicle and placed him in handcuffs for officer safety."  Def.'s Ex. 1.  Corporal Pearson "asked [Defendant] to identify himself," and then "[a]sked him if he had any weapons, needles, anything that could stick . . . or hurt [Cpl. Pearson] on him" before Cpl. Pearson patted him down.  Tr. 7:10-12.  Defendant asserts that the stop executed by Cpl. Pearson was beyond the purview of *Terry*.  Def.'s Mot. (Doc. 19) at 4 ("[T]he seizure and custodial arrest of [Defendant] was not part of a typical traffic stop.  In fact, it is inapposite to call it a 'traffic stop' at all.").  The court does not agree.

Because officers may take reasonable steps to ensure their safety so long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous, an investigatory stop does not ripen into an arrest simply because an officer handcuffs a suspect.  *See United States v. Lester*, 477 F. App'x 697, 700 (11th Cir. 2012) (citing *United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989)); *see also Gray*

16

*ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1306 (11th Cir. 2006) ("[T]his Court has long concluded that it is reasonable for officers to use handcuffs to protect themselves during an investigative detention").  Similarly, under *Terry*, a law enforcement officer, during the course of an investigatory stop, may conduct a "reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual."  *Terry*, 392 U.S. at 27.  The test is "whether a reasonably prudent man in the circumstance would be warranted in the belief that his safety or that of others was in danger." *Id*. (citations omitted).  A pat-down search is permissible if an officer "ha[d] reason to believe that he [was] dealing with an armed and dangerous individual, regardless of whether he ha[d] probable cause to arrest the individual for a crime."  *Id*.;  *see U.S. v. Gibson*, 64 F.3d 617, 624 (11th Cir. 2995) (internal citations and quotations omitted) ("A law enforcement officer responding to a tip involving guns may take these hazards into consideration when balancing the suspect's interests against the need for law enforcement officers to protect themselves and other prospective victims of violence.").

Here, Cpl. Pearson had several reasons to believe that he was dealing with an armed and dangerous individual.  First, the BOLO was issued because Defendant was wanted for questioning in connection with a string of armed home invasion robberies.  Tr. 5:20-23.  Additionally, the BOLO explicitly stated that Defendant should be considered armed and dangerous.  Gov't Ex. 1.  Accordingly, Cpl. Pearson was permitted to place Defendant in handcuffs and to perform a pat-down search for officer safety, and doing so did not convert a *Terry* stop into a formal arrest.

Once Defendant stated that he had a firearm in his vehicle, Cpl. Pearson sat Defendant, who was still handcuffed, on a curb at the back of the vehicle and waited for backup to arrive.   Tr. 6:14-21.   An officer may delay an investigatory stop for a reasonable amount of time to allow back-up officers to arrive so that the officers can safely continue questioning the individual stopped without transforming the *Terry* stop into an arrest.   *Lester*, 477 F. App'x at 697 (finding it reasonable for officer to wait five to ten minutes for backup to arrive).   Here, the backup arrived within a "[c]ouple minutes."   Tr. 8:13.   The court finds this to be a reasonable delay that did not transform the *Terry* stop into an arrest.

### C.     *The Formal Arrest of Defendant*

While waiting on backup to arrive, *i.e.*, during the lawful *Terry* stop, Cpl. Pearson contacted Det. Schnupp, who knew that Defendant had a felony record.   Tr. 25:8-10, 26:16-20.   Once Cpl. Pearson informed Det. Schnupp that Defendant had a firearm in his vehicle, there was probable cause that Defendant was a felon in possession of a firearm. *See United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) (finding, in probable cause analysis, the collective knowledge of officers may be considered "if they maintained at least a minimal level of communication during their investigation").

Detective Schnupp instructed Cpl. Pearson to "make sure [Defendant] was handcuffed" and "that he was currently under arrest for being in possession of a firearm." Tr. 25:8-14.   "Indeed, '[w]hen an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense

18

vitiates the arrest.'" *Lee v. Ferraro*, 284 F.3d 1188, 1196 (11th Cir. 2002) (quoting *United States v. Saunders*, 476 F.2d 5, 7 (5th Cir. 1973) (holding that arrest was valid based on marijuana possession even though agents making arrest relied only on charges of harboring and concealing a fugitive, for which there was no probable cause) (citations omitted)).   Because there was probable cause to believe Defendant was a felon in possession of a firearm, there was no Fourth Amendment violation when Cpl. Pearson placed Defendant in the police car to transport him to the criminal investigative division, thereby transforming the lawful *Terry* stop turned into an arrest.

### D.    Issues with **Miranda** *and the Legality of the Search*

Defendant briefly mentioned in his motion to suppress that he was not advised of his *Miranda* rights prior to Cpl. Pearson's questioning Defendant about whether he had any weapons.  Def.'s Mot. (Doc. 19) at 3.  Aside from this one statement in Defendant's proposed findings of fact, no legal analysis or authority regarding *Miranda* is included in Defendant's motion or post-hearing brief.

The entitlement to *Miranda* warnings attaches only "when custodial interrogation begins." *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004).  "A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  "General 'on-the-scene questioning,' however, concerning the facts and circumstances surrounding a crime or other general questioning of citizens during the fact-finding process do not trigger *Miranda* warnings." *United States v. Moore*, No.

19

2:14-CR-0019-JHH-HGD, 2015 WL 163388, at *4 (N.D. Ala. Jan. 13, 2015) (citing *Miranda*, 384 U.S. at 477–78; *United States v. Scalf*, 725 F.2d 1272, 1276 (10th Cir. 1984)).

Defendant's assertion that there was a formal arrest prior to the time Defendant stated that he had a firearm has been fully considered, and rejected, above.  The court has determined that Defendant was not under arrest at the time the statement was made, but that Cpl. Pearson was conducting a legal *Terry* stop.

Although Defendant fails to raise the argument himself, the court does acknowledge that *Miranda* warnings may be required even before a formal arrest is made if the circumstances of the stop involve a highly intrusive, coercive atmosphere.  *United States v. Acosta*, 363 F.3d 1141, 1150 (11th Cir. 2004).  Recently, our sister court in the Northern District considered whether an individual, Tavares Lavell Moore, who was handcuffed, was entitled to *Miranda* warnings prior to being asked if he had a permit for a weapon that was recovered during a valid *Terry* frisk.  *Moore*, 2015 WL 163388, at *2. The court explained,

> Moore was stopped in a public place, subject to scrutiny of anyone passing by. He was not subjected to abusive language or subjected to any questioning other than that which was necessary to determine if a violation of the law regarding carrying a concealed weapon had occurred. There is no testimony that the officers ever drew their weapons or pointed them at defendant. The totality of the circumstances was such that a reasonable person in Moore's position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else. The manner in which Moore was secured before questioning did not turn the *Terry* stop into an arrest. Furthermore, the manner in which the questioning occurred was not so overbearing as to constitute "custody" in the *Miranda* sense so as to require a warning. Therefore, Moore's statement is not subject to suppression.

20

*Id.* at \*5.

Defendant was also stopped in a public place and not subjected to abusive language. There was only one officer present at the time Defendant was asked if he had any weapons. There was no evidence that Cpl. Pearson pointed his weapon, or even drew it, at any time. The totality of the circumstances does not lead the court to find that Defendant was in custody for the purposes of *Miranda*. *See United States v. Leshuk*, 65 F.3d 1105, 1109-10 (4th Cir. 1995) (finding statements made during *Terry* stop were admissible, the court noted that "we have concluded that drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes"). Accordingly, Defendant was not yet entitled to *Miranda* warnings.

In his post-hearing brief, Defendant contends that after he admitted to having a firearm in his vehicle, "police officers searched [the] car without his consent." Def.'s Br. (Doc. 30) at 3. Defendant argues that this was illegal because "Pearson admitted in his testimony that he did not know [Defendant] was a convicted felon." *Id.* Thus, Defendant argues, "if the arrest was illegal, then so was the search" of Defendant's vehicle to locate the firearm. *Id.*

However, as discussed above, the court may consider "the collective knowledge" of Cpl. Pearson and Det. Schnupp. *Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985). Detective Schnupp was aware that Defendant was a convicted felon. Tr. 26:16-20. There is no testimony that the gun was retrieved from the vehicle prior to Cpl. Pearson's

21

informing Det. Schnupp that Defendant had a firearm in his vehicle.   Accordingly, Defendant's arrest on this charge was not in violation of the Fourth Amendment or otherwise unlawful, and he is not entitled to suppression of any evidence on the basis of a purported unlawful search or arrest.

## III.   CONCLUSION

For all of the foregoing reasons, the undersigned RECOMMENDS that Defendant's "Motion to Suppress" (Doc. 19) be DENIED.

It is further ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **May 29, 2015**.   Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.   Frivolous, conclusive, or general objections will not be considered by the District Court.   The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.   *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); s*ee also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 15th day of May, 2015.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE